[Docket Nos. 20, 27, 37.]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

UNITED STATES OF AMERICA,

v.

TAUHID TAYLOR,

　　　　Defendant.

Crim. No. 23-477 (RMB)

**OPINION**

**RENÉE MARIE BUMB, Chief United States District Judge**

　　　Defendant Tauhid Taylor asks this Court to suppress a magazine loaded with ammunition that Camden County Police Officers recovered during a warrantless stop and search.  Taylor argues that the police unlawfully stopped and searched him because they had neither a reasonable, articulable suspicion of criminal activity nor probable cause to do so.  He also asks this Court to suppress the statements that he made to the police during that stop—that he had bullets on him and that he sells them.  According to Taylor, those statements are the product of an unlawful arrest, and the police obtained those statements in violation of *Miranda*.[1]  On top of his suppression motion, Taylor asks this Court to dismiss his pending charge for being a felon-in-possession of ammunition, in violation of 18 U.S.C. § 922(g)(1).  He claims the law is unconstitutional across the board and as applied to him.  Lastly, he asks this Court to order the Government to produce a host of discovery.

　　　For the below reasons, the Court **DENIES** those aspects of Taylor's omnibus motion seeking to suppress evidence and to dismiss the indictment.  The Court **DENIES AS MOOT** those aspects of Taylor's motion seeking discovery.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

## I.  BACKGROUND

The Court takes the following facts from the testimony at the evidentiary hearing, the body camera videos admitted into evidence at the hearing, the motion record, and the parties' briefs.

### A. The Report:  A Person with a Gun

In June 2022, Camden County Police Officers Stephen Marakowski, Justin Samson, and Kevin Wynn were dispatched to the Crestbury Apartment Complex based on a report of a person with a firearm.  [Hr'g Tr. 6:21 to 7:8 (Docket No. 48); *see also* Def. Ex. C (CAD Report).]  Marakowski is familiar with the Crestbury Apartment Complex; he has been dispatched there before for "a variety of calls" like a "person with a firearm, robberies, shooting[s], domestic violence incidents, carjackings, [and] disturbances[.]"  [Hr'g Tr. 8:9 to 19.]  Marakowski considers the apartment complex to be "a high crime area."  [*Id.* at 8:20 to 21.]

Raymond Jacobs, the apartment complex's security director, called the police because "maintenance" had been threatened in an apartment.  [Gov't Ex. 1 (Marakowski Body Camera); *see also* Hr'g Tr. 12:9 to 13.]   The officers went to an apartment unit belonging to Robin Reevey, knocked on her door, and announced their presence.  [Gov't Ex. 1; Hr'g Tr. 11:7 to 12:2.]  No one responded.  [*Id.*]

The officers then met with Jacobs.  [Gov't Ex. 1.]  Marakowski is familiar with Jacobs, having interacted with him before in connection with criminal investigations at the Crestbury Apartment Complex.  [Hr'g Tr. 35:15 to 23.]  Marakowski considers Jacobs to be "a pretty credible source as far as getting accurate information."  [*Id.* at 35:21 to 22; *see also id.* at 14:16 to 19.]  At the scene, Jacobs told the officers that a maintenance worker, later identified as

William Barr, had been in Reevey's apartment and saw a man, later identified as Defendant Tauhid Taylor, who "presented or brandished or made a gesture that he had some -- firearm on him." [Hr'g Tr. 13:3 to 9; Gov't Ex. 1.] Jacobs then told the officers that Reevey and Taylor were having a "domestic." [Gov't Ex. 1.] Jacobs explained that Taylor has a history of "domestic issues" with Reevey and that he has been arrested for domestic violence before. [Gov't Ex. 1; Hr'g Tr. 13:17 to 24.] He added that Reevey had called the apartment complex's main office that day looking to find a domestic violence shelter. [*Id.*]

After speaking with Jacobs, the officers returned to Reevey's apartment. [Gov't Ex. 1.] Reevey spoke with the officers, detailing her lengthy history of domestic violence with Taylor, which included a restraining order she had against him, and several years Taylor spent incarcerated for domestic violence-related charges. [*Id.*] Reevey told the officers that she "kept getting him locked up," but the domestic violence persisted. [*Id.*] She recounted an episode from a week earlier where the police had arrested Taylor for breaking her nose and damaging her apartment. [*Id.*] Yet Taylor was released the next day. [*Id.*] Reevey told the officers that she had a restraining order against Taylor. [*Id.*] Reevey also mentioned her plan to look for a domestic violence shelter. [*Id.*; *see also* Hr'g Tr. 16:6 to 15.] According to Marakowski, Reevey had a "sense of worry on her face and she seemed defeated." [Hr'g Tr. 16:8 to 9.]

Reevey then detailed an altercation she had with Taylor earlier that day. [Gov't Ex. 1.] She explained that Taylor had kicked several doors in her apartment, causing damage. [*Id.*] Reevey allowed the officers into her apartment and showed them the damage, including one door that had been removed from its hinges. [*Id.*; Hr'g Tr. 18:12 to 21.] She initially refused to file a domestic violence complaint against Taylor, but again told the officers about

her plan to stay at a domestic violence shelter. [Gov't Ex. 1.] The officers continued to question Reevey on whether she wanted to file criminal charges against Taylor or seek a restraining order. [*Id*.] Reevey told the officers she planned to file a domestic violence complaint later that day. [*Id*.] She added that she believed the restraining order she had against Taylor was in effect. [*Id*.] Marakowski explained to Reevey her rights as a domestic violence victim, like the right to file a criminal complaint and seek a restraining order. [*Id*.; Hr'g Tr. 19:8 to 15.] According to Marakowski, the officers wanted Reevey to have "all resources available for her so she feels safe." [Hr'g Tr. 19:14 to 15.] Based on the information received, the officers believed they had two incidents to investigate: (1) a domestic violence incident involving criminal mischief; and (2) a possible person with a firearm. [Hr'g Tr. 15:19 to 25, 18:22 to 24, 21:15 to 20, 36:22 to 37:2.]

Marakowski then walked back to his police cruiser to retrieve "a victim notification" for Reevey, while Samson and Wynn stayed behind with her at the apartment. [Gov't Ex. 1; Hr'g Tr. 20:19 to 21.] Marakowski went to the apartment complex's main office to update Jacobs. [Hr'g Tr. 20:19 to 23.] At the main office, Marakowski met with Jacobs and Barr. [Gov't Ex. 1.] Jacobs showed Marakowski surveillance footage from earlier that day depicting Taylor walking across the complex's courtyard wearing a jacket. [*Id*.] Marakowski observed, "It's 90 degrees out and the guy's got a full-blown jacket on." [*Id*.] Jacobs commented, "That's a dead giveaway." [*Id*.; Hr'g Tr. 23:6 to 9.] Marakowski found Taylor's clothing "very unusual" since "it was not matching the season, and it was not consistent with the weather conditions." [Hr'g Tr. 22:13 to 20.] Based on his "past training and experience," Marakowski explained that "anyone who's wearing that type of clothing is presumably trying to hide or discard or conceal a weapon." [*Id.* at 22:21 to 23.]

4

After watching the surveillance footage, Barr described his encounter with Taylor. [*Id.*] Barr explained that he went to Reevey's apartment to repair a leaking toilet, but he believed Reevey had called maintenance because she was scared, not because the toilet had been leaking. [*Id.*; Hr'g Tr. 24:5 to 11.] When Barr arrived at Reevey's apartment, he waited outside because someone was in the bathroom. [Gov't Ex. 1.] While waiting, Taylor came out of the apartment, looked at Barr and said, "Don't let this bitch get you in no shit." [*Id.*] As Taylor walked away, he made a similar comment to Barr. [*Id.*]

Taylor returned to the apartment a few moments later. [*Id.*] Barr then reluctantly entered the apartment to start fixing the toilet. [*Id.*] While working, Barr overheard Taylor and Reevey arguing. [*Id.*] During that argument, Taylor said, "he knows me," and "I love killing these pussy motherfuckers." [*Id.*] Barr understood Taylor's comments were directed at him. [*Id.*] Barr then left the apartment and informed his supervisor about the incident. [*Id.*]

Barr told Marakowski "it looked like [Taylor] had a gun in his pocket." [*Id.*] Barr denied that Taylor had pointed a gun at him. [*Id.*] While Barr could not be "100%" certain, he told Marakowski that it looked like, and he believed that, Taylor had a gun in his right pocket, describing it as "black[,]" which according to Barr, "explains the jacket in 90-degree weather." [*Id.*] Marakowski then headed back to Reevey's apartment, and on the way there, he heard Samson radio, "suspect back on the scene." [*Id.*; Hr'g Tr. 25:16 to 19.]

Meanwhile, Samson and Wynn had remained in Reevey's apartment. [Gov't Ex. 2 (Samson Body Camera).] At one point, Taylor opened the front door and asked, "Where's my baby mom at?" [*Id.*] As he did so, Taylor held the door open with one hand, blocking the right side of his body with the door. [*Id.*] Taylor had positioned his body "bladed away from [Samson]" and had his "hand in his pocket." [Hr'g Tr. 78:21 to 22.] Samson observed

Taylor "wearing a jacket, face mask, and a hat." [*Id.* at 78:19 to 20.] According to Samson, Taylor appeared "agitated[,] upset, [and] kind of confused" after opening the apartment door. [*Id*. at 78:12 to 13.] He was "hesitant to come inside, fully enter the residence." [*Id.* at 78:21 to 23.]

Taylor then abruptly shut the door and quickly walked away from the apartment. [Gov't Ex. 2.] Samson could not see Taylor's hands. [Hr'g Tr. 79:1 to 2.] As Taylor walked away, Samson repeatedly shouted for Taylor to "come here[,]" but he did not. [*Id.*] Samson followed Taylor, but Taylor walked around a corner of an apartment building, out of Samson's view. [*Id.*] Samson lost sight of Taylor for "some time." [Hr'g Tr. 79:20 to 22.]

When Samson turned the corner, Taylor turned around and walked quickly back towards the officer. [Gov't Ex. 2.] Taylor appeared upset; he flailed his arms. [*Id.*] Samson asked Taylor, "Where you going?" and "Let me see your hands, bro." [*Id.*] At this point, Samson believed Taylor "is trying to hide something from me or. . . he hid something from me." [Hr'g Tr. 80:6 to 8.] Samson considered Taylor to be "armed and dangerous" because Taylor refused the officer's "orders to come back, he's agitated," and the officers had received information that Taylor "is known to be violent." [*Id.* at 80:11 to 15.]

Samson and Taylor walked back to the apartment together with Taylor voicing his anger about his situation with Reevey. [Gov't Ex. 2.] Taylor told the officer that Reevey had stabbed him last week. [*Id.*] Samson tried to ask Taylor what happened that day, but Taylor said "nothing" and kept walking toward Reevey's apartment. [*Id.*] Samson told Taylor the officers "were not locking him up." [*Id.*] As Samson and Taylor walked, Marakowski approached them, but Taylor continued to walk toward Reevey's apartment. [*Id.*] Samson instructed Taylor to stay put, because he did not want Taylor and Reevey to start arguing.

[*Id.*]  Taylor asked to sit down and began walking to a nearby stoop.  [*Id.*]  But he abruptly turned and again walked toward Reevey's apartment.  [*Id.*]

At that point, Samson and Marakowski grabbed Taylor by the arm and told him that he was being detained so the officers could figure the situation out.  [*Id.*]  Samson told Taylor that he was acting "erratic."  [*Id.*]  Marakowski also found Taylor to be acting erratic and "being very nervous."  [Hr'g Tr. 27:2 to 6.]  The officers treated the encounter with "extreme heightened caution" given Taylor's conduct and the fact that "initial call for service was [for] a person with a firearm."  [*Id.*]  The officers detained Taylor because the scene was not safe, the officers did not want to jeopardize their safety, and the officers wanted to further their investigation.  [*Id.* at 26:23 to 27:1, 27:12 to 15.]  Marakowski explained that Taylor had mentioned he had been stabbed and was a victim of a crime.  [*Id.* at 27:12 to 20.]  Because the officers had received "a lot of conflicting information[,]" they "want[ed] to make sure that [Taylor's] secured and controlled so [the officers] could slow things down [to] further investigate this incident[,]" especially knowing that the call for service was for "a firearm incident."  [*Id.*]

Samson handcuffed Taylor, telling him the officers were detaining him.  [Gov't Ex. 2.]  Marakowski gave a brief pat-down of Taylor's front pants' pocket.  [Gov't. Ex. 1; *see also* Hr'g Tr. 27:21 to 24.]  The officers assured Taylor that they were not locking him up and that they were not going to search him, but that they had to investigate the domestic violence incident.  [Gov't Exs. 1-2.]  When asked, Taylor denied having any weapons on him.  [*Id.*]

Once Taylor was secure on the stoop, Samson told Marakowski that Taylor had walked briefly out of the officer's view and that Taylor had his hand in his pocket.  [Gov't Ex. 1; *see also* Hr'g Tr. 29:12 to 22.]  Samson believed Taylor may have discarded a firearm.  [Hr'g

Tr. 29:25 to 30:5.] The two officers then retraced Taylor's route to see if Taylor had tossed a gun. [Gov't Exs. 1-2.] Samson recounted how Taylor entered the apartment, with half his body covered by the front door. [*Id*.] Marakowski explained he frisked Taylor's "front-left pocket[,]" but stated it was his wallet. [Gov't Ex. 1.] Samson asked Marakowski about Taylor's jacket pocket, but Marakowski did not search it. [Gov't Ex. 2; Hr'g Tr. 64:24 to 65:3.] Samson did not search Taylor's jacket pocket either. [*Id*.] Since neither officer frisked Taylor's jacket nor could they locate a firearm, Samson decided to pat-down Taylor again. [Gov't Exs. 1-2; Hr'g Tr. 60:21 to 61:17; 62:12 to 23; 81:15 to 21.]

Both officers then walked back to the stoop where Taylor had been sitting. [Gov't Ex. 2.] At that time, Taylor's jacket had been slightly removed; it was hanging off his shoulders. [*Id*.] Samson placed the jacket back on Taylor and had him stand up. [*Id*.] While asking Taylor what he had in his jacket pockets, Samson patted-down the outer layer of Taylor's jacket pockets. [*Id*.] Taylor said he "had it right here," and when Samson asked, "What is it?" Taylor responded, "bullets . . . there's bullets in there bro." [*Id*.; *see also* Hr'g Tr. 32:1 to 5.] Samson then asked whether Taylor had a magazine in his pocket. [Gov't Ex. 2.] Taylor admitted that he did. [*Id*.] Samson asked Taylor, "Where's the gun?", but Taylor denied having one. [*Id*.] Taylor told the officers that he sells the bullets. [*Id*.] Samson confirmed Taylor had a magazine in his pocket. [*Id*.] Marakowski then reached into Taylor's jacket pocket and removed a firearm magazine.[2] [*Id*.] That magazine was loaded with 15 bullets. [Def. Mem. of Law in Supp. of Omnibus Mot. 2, (Def. Br. I), Ex. A (Police Report) (Docket Nos. 20-1, 20-2).]

---

[2] At the evidentiary hearing, Marakowski testified that he did not recover the magazine and bullets from Taylor's person. [Hr'g Tr. 32:7 to 9.] He "believe[d]" Samson did. [*Id*.] Marakowski's and Samson's body camera footage shows Marakowski removing the magazine from Taylor's jacket pocket. [Gov't Ex. 2.] The Court relies on the body camera footage.

Marakowski eventually requested a "track" to search for a firearm that the officers suspected Taylor had discarded. [*Id.*] A police K-9 unit conducted an article search and located a handgun behind a fence near where Taylor initially walked out of Samson's view. [*Id.*; *see also* Gov't Mem. of Law in Opp'n to Taylor's Omnibus Mot. 5-6 (Gov't Br. I) (Docket No. 28); Hr'g Tr. 55:23 to 56:4.] The police recovered a black, 9mm, privately manufactured firearm, known as a "ghost gun," loaded with a 30-round extended magazine. [Police Report; *see also* Gov't Br. I at 6.]

### B. Taylor's Pending Charge

A federal grand jury ultimately indicted Taylor for being a felon-in-possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). [Docket No. 1.] While the indictment mentions the "ghost gun" the police recovered, the indictment only alleges that the ammunition that Taylor possessed "was in and affecting commerce." [*Id.*] The Government has since clarified that Taylor's § 922(g)(1) charge is based on his possession of the ammunition, not the ghost gun. [Gov't Br. I at 19; *see also* Hr'g Tr. 101:20 to 22.]

Turning to Taylor's criminal history, the Government asserts Taylor has many felony convictions, including two unlawful possession of a weapon convictions, three drug-trafficking convictions, and an aggravated assault conviction. [Gov't Mem. of Law in Opp'n to Def. Omnibus Mot. 7 (Gov't Br. II) (Docket No. 31).] And at the time Taylor possessed the ammunition in June 2022, Taylor had been on pretrial release for allegedly assaulting Reevey. [*Id.*; *see also* Gov't Ex. 1 (Docket No. 31-1).]

### C. The Evidentiary Hearing

After Taylor moved to suppress the ammunition the police recovered from his person, this Court held an evidentiary hearing on Taylor's motion. At the hearing, the Government

presented testimony from Marakowski and Samson.  The Court also received into evidence the officers' body camera videos from the day of Taylor's arrest.  The officers testified about their interaction with Jacobs, Reevey, and Taylor (discussed above).

## II. THE SUPPRESSION MOTION

Taylor moves to suppress the ammunition the police recovered from his person, arguing the officers lacked both reasonable suspicion and probable cause to stop and search him.  [Def. Br. I at 15, 18-20.]  He adds that the officers were not justified in conducting a second pat-down.  [*Id.* at 20-25.]  According to Taylor, the officers had already conducted a pat-down that yielded nothing, and the officers developed no additional facts to support a second pat-down.  [*Id.* at 21.]  The officers could not—without probable cause—search him again.  [*Id.*]  Lastly, Taylor contends that his statement about possessing and selling bullets should be suppressed.  [*Id.* at 24.]  He argues the police obtained those statements from an illegal interrogation.  [*Id.*]

The Government asks this Court to deny Taylor's suppression motion.  [Gov't Br. I at 8.]  The Government contends the police had reasonable suspicion to stop and frisk Taylor based on the information provided by Jacobs, Barr, and Reevey, as well as Taylor's conduct at the apartment complex, including his flight from the officers.  [*Id.* at 9-17.]  The Government explains that the officers were investigating a domestic violence report and that Barr had told the officers he thought he had seen a gun in Taylor's pocket.  [*Id.*]  Given the unique and potential danger in this on-going domestic violence investigation, the officers were justified in detaining Taylor and frisking him for weapons.  [*Id.*]  The Government adds that the officers lawfully conducted a second pat-down, arguing the first frisk was cursory.  [*Id.* at 17-18.]  The Government argues that the officers' first frisk did not dissipate the officers'

reasonable suspicion that Taylor was armed and dangerous because the officers had not frisked Taylor's jacket pocket.  [*Id.* at 17.]  The Government asserts that once the second, valid frisk produced a loaded magazine, the officers had probable cause to arrest Taylor and search him incident to arrest.  [*Id.* at 18.]

### A.  Officer Credibility

On a motion to suppress evidence, district courts must determine the credibility of witnesses, weigh the evidence, and reach "any 'inferences, deductions and conclusions to be drawn from the evidence.'"  *United States v. Cole*, 425 F. Supp. 3d 468, 473 (W.D. Pa. 2019) (quoting *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)); *see also United States v. Graham*, 2014 WL 3396495, at *4 (D.N.J. July 9, 2014) (citing *Gov't of the V.I. v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974)).  District courts may "accept or reject any or all of a witness's testimony."  *Graham*, 2014 WL 3396495, at *4 (quoting *United States v. Demings*, 787 F. Supp. 2d 320, 326 (D.N.J. 2011)).  In assessing a witness's credibility, courts "should consider:  the witness's demeanor and manner on the stand; the witness's ability to accurately recollect the matters at hand; and the extent to which the testimony withstands a common-sense test of reason and logic."  *United States v. Harris*, 2023 WL 5425395, at *4 (D.N.J. Aug. 23, 2023).

Having had the opportunity to view Marakowski's and Samson's demeanor during questioning, the Court finds them both credible.  Both officers testified in a calm and straight-forward manner, and provided detailed testimony.  The officers' body camera footage, which the Court received into evidence, aligns with their testimony.  Thus, the Court credits Marakowski's and Samson's testimony in full.

11

### B. *Terry* Stops and Frisks

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures."   U.S. Const. amend. IV.   "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies."  *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010)).   When, as here, the Government obtains evidence from a warrantless search or seizure, then the Government must show, by a preponderance of the evidence, that an exception to the warrant requirement applies.  *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992).   Otherwise, the exclusionary rule bars the admission of illegally obtained evidence.  *Id.*

An investigatory or *Terry* stop is one such exception to the warrant requirement.  *Terry v. Ohio*, 392 U.S. 1 (1968).  A police officer may make an investigatory stop "when [the] officer has a reasonable articulable suspicion that criminal activity is afoot[.]"  *Hester*, 910 F.3d at 84 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).   During that stop, the officer may conduct a safety frisk when "there are reasonable grounds to believe that [a suspect] [is] armed and dangerous."  *Terry*, 392 U.S. at 30.   To justify a *Terry* stop and frisk, the officer must "point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant that intrusion."  *Id.* at 21; *see also United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) ("The reasonable suspicion that justifies the *Terry* stop of a suspect also justifies a subsequent protective frisk of that suspect, where officers have reason to believe that the suspect may pose a danger to the officer.").

To determine whether a stop and frisk is justified, courts "must view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers."

12

*United States v. Yamba*, 506 F.2d 251, 255 (3d Cir. 2007) (quoting *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984)).  This is an "objective standard" requiring courts to determine whether "the facts available to the officer at the moment of the seizure or the search would warrant a man of reasonable caution in the belief that the action taken was appropriate[.]" *Terry*, 392 U.S. at 21-22.  In the totality of circumstances inquiry, courts should consider the "officer's specialized knowledge and investigative inferences," the reputation of the area where the stop occurred (high crime), the time of the stop, the suspect's movements, any suspicious conduct, or behavior "that conforms to the police officers' specialized knowledge of criminal activity." *Hester*, 910 F.3d at 87 (quoting *United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006)); *see also United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012).

When examining the totality of the circumstances, courts must consider any information the police received from victims, witnesses, or informants.  *See generally Adams v. Williams*, 407 U.S. 143, 146-47 (1972).  Reasonable suspicion depends on "the content of information possessed by police and its degree of reliability[,]" and  "[b]oth factors—quantity and quality—are considered in the totality of the circumstances[.]" *Alabama v. White*, 496 U.S. 325, 330 (1990) (citation and internal quotation marks omitted).

Information from crime victims or witnesses is presumed reliable and officers can act on that information.  *See United States v. Brown*, 448 F.3d 239, 249 (3d Cir. 2006) (holding that information from a witness who recently observed the alleged criminal activity is generally viewed as reliable); *see also Adams*, 407 U.S. at 147 (explaining that "when the victim of a street crime seeks immediate police aid and gives a description of his assailant," that information warrants a police response); *accord United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006) ("An eye witness's statement that he or she saw a crime committed or was the

13

victim of a crime is generally sufficient to establish probable cause."). This is so because the officers can assess the witness' or victim's credibility in the moment. *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000). Likewise, a victim or witness who provides information to the police face-to-face is considered more reliable because, by making themselves known to the police, they expose themselves to criminal liability if they knowingly provide false information. *Id.* at 354-55.

The government's need to show a reasonable articulable suspicion "is only triggered by a seizure, which occurs when an officer applies physical force or when a person submits to an officer's 'show of authority[.]'" *Hester*, 910 F.3d at 84 (alteration in original) (quoting *California v. Hodari D.*, 499 U.S. 621, 625 (1991)). Thus, when faced with a motion to suppress, courts must first determine whether a seizure occurred and, if so, when. *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014). A person is constitutionally seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Here, all agree that the officers seized Taylor when they physically grabbed his arm, handcuffed him, and told him that he was "being detained." [Gov't Br. I at 9; Def. Br. I at 17-18.] The parties disagree on whether the officers were justified in doing so. Given the information that the police had received and Taylor's conduct before the officers restrained him, the Court finds the officers had a reasonable suspicion to stop and frisk him. *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018) ("Reasonable suspicion must exist at the time of the *Terry* stop.").

14

### 1. The Officers had Reasonable Suspicion to Stop and Frisk Taylor

The totality of the circumstances here gave the officers reasonable suspicion to believe that Taylor had engaged in, or was engaging in, criminal activity at the time of the stop. Indeed, the officers had reason to believe that Taylor had engaged in domestic violence (property destruction in Reevey's apartment) and that he was in possession of a firearm.

Start with the citizen reports. The officers here received information from known citizen-complainants and witnesses about an on-going domestic violence episode involving property damage and a perpetrator with a history of domestic violence who may have been armed and dangerous. The officers could act on that information because Jacobs, Barr, and Reevey provided it during face-to-face encounters, allowing the officers to assess their credibility first-hand. *See Valentine*, 232 F.3d at 354-55.

Indeed, Jacobs, the person who initially called the police, relayed to the officers what he had learned from Barr. Marakowski has had prior dealings with Jacobs in other criminal investigations at the apartment complex, and the officer considers him "a pretty credible source as far as getting accurate information." [Hr'g Tr. 35:15 to 23; *see also id.* at 14:16 to 19.] Jacobs also told the officers about the on-going domestic violence situation between Taylor and Reevey, including Reevey's request to find a domestic violence shelter. Jacobs also told the officers about Taylor's previous arrests for domestic violence. And he showed Marakowski surveillance footage from that day, identifying Taylor at the apartment complex. The surveillance video showed Taylor wearing a jacket on a hot summer day, a detail that raised the officer's suspicion.

Barr, an eye-witness, told the officers about his first-hand interaction with Taylor. He overheard Taylor's and Reevey's domestic dispute and heard Taylor's threatening remark—

"I love killing these pussy motherfuckers[,]" Gov't Ex. 1—that Barr understood was directed at him.  Barr told the officer he believed he saw a gun in Taylor's jacket pocket, describing it as "black."  *See United States v. Baker*, 2019 WL 6975054, at *2-4 (D.N.J. Dec. 19, 2019) (upholding *Terry* stop and frisk where a concerned citizen waved a police officer down, reported seeing a man brandishing a handgun, and provided the suspect's physical description and location).

Reevey also provided her own first-hand account about Taylor that day.  Besides walking through her history of domestic violence with Taylor, she showed the officers the damage Taylor caused to her apartment that day: he had kicked doors and took one off its hinges.  Reevey's information corroborated Barr's account that she and Taylor had been involved in a domestic dispute that day.  That corroboration bolstered the reliability of Barr's information that Taylor may be armed "[b]ecause an informant [who] is right about some things, . . . is more probably right about other facts[.]"  *Illinois v. Gates*, 462 U.S. 213, 244, (1983) (citation and internal quotation marks omitted).

Taken together, the information the officers had here presents a stronger case for reasonable suspicion than in other cases where the Third Circuit has upheld a *Terry* stop and frisk.  *See, e.g.*, *United States v. McCants*, 952 F.3d 416, 424 (3d Cir. 2020) (upholding *Terry* stop and frisk where the police received information from an anonymous 911 caller who reported an on-going domestic violence incident involving a possibly armed perpetrator and provided location and perpetrator's physical description).

Then there is Taylor's clothing.  The officers observed, and the surveillance video showed, Taylor wearing a jacket on a hot summer day.  Marakowski found Taylor's clothing choice suspicious because, based on his training and experience, individuals who wear those

types of clothes in that climate are possibly concealing a weapon.  [Hr'g Tr. 22:13 to 23.]  And both Jacobs and Barr found Taylor's clothing choice odd.  Jacobs thought Taylor's jacket choice was a "dead giveaway."  [Gov't Ex. 1; Hr'g Tr. 23:6 to 9.]  Barr told Marakowski that he believed Taylor had a gun in his pocket, in part, because of Taylor's jacket.  [Gov't Ex. 1 (Barr telling Marakowski "explains the jacket in 90-degree weather").

Courts have found that the wearing of off-season clothing, like jackets on a hot summer day, can be suspicious and an appropriate factor to weigh in the totality of circumstances inquiry.  *United States v. Kenney*, 724 F. App'x 551, 554 (9th Cir. 2018) (holding police had reasonable suspicion to stop defendant's car where, among other things, defendant "was wearing sweat pants and a jacket on a warm morning"); *United States v. Jackson*, 2020 WL 2496028, at *8 (M.D. La. May 14, 2020) (upholding *Terry* stop and frisk, considering "[d]efendant's wearing [of] odd clothing that could easily conceal a weapon (a heavy coat on an extremely hot summer day" as one factor in the totality of circumstances analysis); *cf. United States v. Drayton*, 536 U.S. 194, 207 (2002) (explaining that "heavy, baggy cloth[ing] that were ill-suited for the day's warm temperature" may be appropriate factor to consider in the totality of circumstances to determine reasonable suspicion, but declining to resolve).

On top of wearing a jacket on a hot summer day, Samson observed Taylor wearing a face mask.  [Hr'g Tr. 78:19 to 20.]  Wearing a face mask may be considered suspicious because it can conceal one's identity.  *See United States v. Bibbs*, 2025 WL 817593, at *2 (E.D. Pa. Mar. 12, 2025) (finding police had reasonable suspicion given, among other things, defendant's "attire" which was "improperly warm on a late summer night, accompanied by a ski mask").

17

Finally, there is Taylor's conduct. Taylor's behavior solidified the officers' reasonable suspicion to stop and frisk him. During an on-going domestic violence investigation, Taylor burst into Reevey's apartment, partly concealing one part of his body with the front door. After seeing the police, he abruptly left the apartment and walked away while holding his jacket pocket. He ignored Samson's commands and walked out of the officer's view. Taylor's "furtive movements" and failure to follow Samson's commands increased the officers' "reasonable suspicion that criminal activity is afoot," *see United States v. Velazquez*, 2024 WL 49690, at *6 (D.N.J. Jan. 4, 2024) (citation and internal quotation marks omitted), and that Taylor may be armed and dangerous, *see United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997) (ruling *Terry* frisk during motor vehicle stop proper reasoning passenger's "furtive hand movements and refusal to obey the officers' orders constituted suspicious behavior"). *See also District of Columbia v. Wesby*, 583 U.S. 48, 59 (2018) ("Deliberatively furtive actions and flight at the approach of . . . law officers are strong indicia of mens rea." (cleaned up) (quoting *Sibron v. New York*, 392 U.S. 40, 66 (1968))). And once Samson caught up to Taylor, Taylor acted erratically: he flailed his arms, yelled, and repeatedly tried to enter Reevey's apartment despite Samson's commands to remain outside.

In sum, the information the police had received, coupled with Taylor's unusual clothing given the weather and his erratic behavior, gave the officers "reasonable grounds to believe that [Taylor was] armed and dangerous." *Terry*, 392 U.S. at 30. Indeed, Barr provided the officers with specific, reliable facts that Taylor may be armed. And Reevey recounted her past violent encounters with Taylor, including an episode earlier that day. Taken together, that information would warrant a reasonable police officer to believe Taylor could be dangerous. Along with that information, the officers had reason to believe Taylor

18

could be concealing a weapon because he wore a heavy jacket on a hot summer day. *See Jackson*, 2020 WL 2496028, at *8. And Taylor's immediate flight from Samson, during which he reached for his pockets and ignored the officer's commands, gave the officers more reason to believe that Taylor may be armed and dangerous. *See United States v. Acosta*, 751 F. App'x 201, 203 (3d Cir. 2018) (finding reasonable suspicion where, among other things, "the suspect fled without provocation, clutching his side in a manner consistent with having a gun"); *see also Wardlow*, 528 U.S. at 124 (explaining "[h]eadlong flight—wherever it occurs—is the consummate act of evasion" and "certainly suggestive of . . . wrongdoing"); *Moorefield*, 111 F.3d at 14; *accord United States v. Patton*, 705 F.3d 734, 739 (7th Cir. 2013) (explaining "a suspect's failure or refusal to comply with a police officer's order is also a factor that contributes to a reasonable suspicion that he may be dangerous"). These facts, viewed through the lens of the officers' training and experience, gave the officers reasonable suspicion to believe Taylor was armed and dangerous to justify stopping and frisking him.

But Taylor protests, arguing the second pat-down was not a *Terry* frisk, but a search requiring probable cause because the officers had Taylor in handcuffs. [Hr'g Tr. 93:18 to 21; Def. Br. I at 20-21.] He also argues that *Terry* cannot sustain the second frisk because the officers did not obtain any new information to justify that frisk. [Hr'g Tr. 93:22 to 94:2; Def. Br. I at 21.] These arguments lose on both the law and the facts.

First, the fact that the officers handcuffed Taylor did not escalate the investigatory stop "into a full-blown arrest" requiring probable cause. *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010); *see also United States v. Carter*, 2024 WL 195475, at *3 (3d Cir. Jan. 18, 2024) (ruling the officers' actions—handcuffing defendant, placing him in police car, and transporting him to police station for identification—"did not transform the *Terry* stop into a

de facto arrest").  The officers here handcuffed Taylor given his erratic behavior.  Indeed, he repeatedly tried to enter Reevey's apartment despite Samson's instructions to stay outside.  Given Taylor's conduct and the information suggesting Taylor might be armed, the officers acted reasonably by handcuffing him to ensure their safety.  *See Carter*, 2024 WL 195475, at *3; *see also United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) ("[W]hen police officers make an investigative stop, they may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" (quoting *United States v. Hensley,* 469 U.S. 221, 235 (1985))).

Second, *Terry* does not impose a one frisk limit on the police.  4 Wayne R. LaFave, *Search and Seizure* § 9.6(a) (6th ed. 2020) (explaining that "assuming grounds to conduct a frisk" exist, the police are "[n]ot necessarily . . . limited to only one frisk"); *see also United States v. Wilson*, 2007 WL 4225503, at *2 (E.D. Pa. 2007) ("Defendant has not cited, nor has the Court been able to locate, any case law stating that, where a first *Terry* search is warranted, a second *Terry* search cannot be conducted for additional police protection.").  "In appropriate circumstances, a second frisk may be justified."  *United States v. Rasberry*, 882 F.3d 241, 249 (1st Cir. 2018); *accord United States v. Smith*, 32 F.4th 638, 642 (7th Cir. 2022) (explaining "it is not necessarily unreasonable for police to frisk a person more than once," and "[t]here are many cases where a first frisk misses a hidden weapon, sometimes with consequences that are serious or worse" (alteration in original) (quoting *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013))).

Whether a second frisk is reasonable turns on context because "context is vital." *United States v. Osbourne*, 326 F.3d 274, 278 (1st Cir. 2003).  A second frisk may be necessary if the first frisk is limited to one area of the suspect's body, since such limited searches do not

20

dispel an officer's reasonable suspicion that a suspect may be armed and dangerous. *See Rasberry*, 882 F.3d at 249 (upholding a second pat-down where the first one was limited to the defendant's lower back and did not "dispel a reasonable suspicion" that the defendant, who had a history involving firearms, was "carrying a weapon elsewhere on his person"); *see also United States v. Green*, 946 F.3d 433, 439 (8th Cir. 2019) (finding second pat-down reasonable where "the first pat[-]down was quick and cursory" and police seized a weapon from the suspect's companion"). A second frisk may also be necessary if the frisking officer is unaware of an earlier frisk. *Howard*, 729 F.3d at 662 (upholding second frisk as reasonable where officer did not know about the first frisk).

The second pat-down here was reasonable because Marakowski's first frisk was quick and cursory, limited only to Taylor's pants pocket. *See Osborne*, 326 F.3d at 278 (finding the thoroughness of first frisk a relevant factor to weigh when evaluating the reasonableness of a second frisk); *see also Rasberry*, 882 F.3d at 24. And that first frisk did not dissipate the officers' reasonable suspicion that Taylor may be armed and dangerous. Indeed, after securing Taylor, Samson told Marakowski that Taylor had briefly walked out of the officer's view with his hand in his pocket. When the officers canvassed the area, Marakowski told Samson that he had only frisked Taylor's pants pocket. Both officers confirmed that neither had frisked Taylor's jacket pockets. Because the officers had not thoroughly frisked Taylor and may have missed a weapon, *Terry* permitted a second pat-down. *See Howard*, 729 F.3d at 662 (explaining "it would have been reasonable to frisk [defendant] a second time as long as [the officer] had a credible reason to believe that [the other officer] might have missed a dangerous weapon").

Despite Taylor's contrary arguments, the officers did learn new information after handcuffing Taylor that justified the second frisk. While canvassing the area where Taylor had walked off to out of Samson's view, the officers realized they had not frisked Taylor's jacket. And they could not locate a firearm during their canvass. Their inability to locate a firearm increased the officers' concern that Taylor might still have one on his person. [Hr'g Tr. 60:21 to 61:8.] Those new facts prompted the second frisk. [*Id.* at 61:10 to 14.]

And the officers did not exceed the scope of a *Terry* frisk during that second pat-down. A *Terry* frisk is limited to a search of "the outer clothing of [seized] persons in an attempt to discover weapons which might be used to assault [the officer]." *United States v. Graves*, 877 F.3d 494, 599 (3d Cir. 2017) (first alteration in original) (quoting *Navedo*, 694 F.3d at 467-68)). During a *Terry* frisk, an officer can "slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon." *Yamba*, 506 F.2d at 259. Here, Samson limited his search to the outer layer of Taylor's jacket during the second pat-down. [Gov't Ex. 2.] Once he felt an object in the pocket, Samson asked Taylor what it was. [*Id.*] Taylor responded that it was bullets. [*Id.*] At no point did Samson place his hands inside Taylor's jacket pocket before Taylor admitted to possessing bullets. [*Id.*] Therefore, the second frisk was lawful.

## C. The Intersection of *Miranda* and *Terry*: Police Questioning during Investigatory Stops

Taylor asks this Court to suppress his statements—that he possessed bullets and sells them—for two reasons. First, he argues that those statements are the fruit of an unlawful seizure, and as such, should be suppressed. [Hr'g Tr. 94:3 to 12; Def. Br. I at 24.] Second, he contends the police obtained those statements in violation of his Fifth Amendment

privilege against self-incrimination because the officers never *Mirandized* him, and so the statements should be suppressed. [*Id.*] These arguments are meritless.

To start, the officers did not unlawfully seize Taylor. As explained above, the officers had reasonable suspicion to stop and frisk him. Thus, no unlawful seizure occurred that could have tainted Taylor's statements. *See United States v. Thomas*, 797 F. App'x 730, 733 (3d Cir. 2020).

Taylor's other constitutional challenge to the admissibility of his statements fares no better. The Fifth Amendment of the United States Constitution grants criminal defendants the privilege against self-incrimination. U.S. Const. amend. V. This protects an individual from being "compelled in any criminal case to be a witness against himself." *Id*. A defendant must be warned of his right against self-incrimination and his right to an attorney before he can be subjected to a custodial interrogation by law enforcement. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogation occurs when law enforcement questions a defendant after he "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 444).

The custodial interrogation inquiry "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). It requires courts to examine: (1) "the circumstances surrounding the interrogation[;]" and (2) "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted). "[T]he ultimate inquiry is: whether there is a formal arrest or restraint on freedom

of movement of the degree associated with a formal arrest." *United States v. Vidal*, 85 F. App'x 858, 861 (3d Cir. 2004) (internal citation omitted).

"Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012). Indeed, "the temporary and relatively nonthreatening detention involved in a . . . *Terry* stop . . . does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010). During a *Terry* stop, an "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). That said, the line between an investigatory stop and an arrest is sometimes difficult to draw. *See, e.g.*, *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (observing that caselaw "may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest"). So, to determine whether a person is in custody, and thus, triggering *Miranda*, courts examine:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010); *accord United States v. Palmer*, 111 F.4th 588, 594 (5th Cir. 2024) (identifying similar factors to examine to determine whether a person "was 'in custody' for *Miranda* purposes"). Those factors help determine whether a person is in custody, but that does not end the inquiry. Courts must also examine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509.

### 1. Taylor was not in custody when he admitted to having bullets in his jacket pocket

Taylor was not in custody when he told the officers he had bullets in his pocket because the interrogation took place in public, the officers' questions were limited and non-accusatory, and Taylor's responses were voluntary. *King*, 604 F.3d at 138.

First, the officers stopped and questioned Taylor outside, in the common area at the apartment complex—a fact cutting against finding custody. *United States v. Chavira*, 614 F.3d 127, 135 (5th Cir. 2010) ("Interrogations in public settings are less police dominated than stationhouse interrogations; the public nature reduces the hazard that officers will resort to overbearing means to elicit incriminating responses and diminishes the individual's fear of abuse for failure to cooperate.").

Second, the officers repeatedly told Taylor that he was not under arrest—another fact weighing against finding custody. *Cf. United States v. Harder*, 180 F. Supp. 3d 355, 363 (E.D. Pa. 2016) (finding defendant not in custody even where "[n]o one told [d]efendant that he was under arrest or that he was not free to leave"); *accord United States v. Coulter*, 41 F.4th 451, 461 (5th Cir. 2022) ("Informing a suspect he is 'not under arrest, [even without] explicitly tell[ing] him he [is] free to leave[,] . . . would [also] suggest to a reasonable person that he [is] free to leave[.]'" (alterations and omissions in original, footnote omitted) (quoting *United States v. Ortiz*, 781 F.3d 221, 231 (5th Cir. 2015))). And even when the officers handcuffed Taylor, they reassured him that they were not arresting him. Samson told Taylor that they were only handcuffing him because Taylor was acting erratically.

Third, after handcuffing Taylor, Samson asked only minimal questions, which Taylor answered voluntarily. Indeed, during the second pat-down, Samson asked Taylor what he had in his jacket pocket after feeling an object. That was a non-accusatory question that

25

officers frequently ask when conducting a pat-down.    At best, the officers had Taylor handcuffed for about eight minutes before Samson questioned Taylor about the contents of his jacket pockets.  [Gov't Ex. 2.]  The officers' encounter with Taylor was a rapidly evolving situation because of the information they had received and Taylor's erratic conduct. Samson's questions during the second pat-down were limited to dispel the officers' suspicions that Taylor may be armed.

To be sure, Taylor was handcuffed at the time Samson questioned him about his jacket pockets' contents—a factor sometimes weighing in favor of custody.  *King*, 604 F.3d at 138; *accord United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.").   But handcuffing alone does not turn an investigatory stop into custody for *Miranda* purposes.  *United States v. Scott*, 420 F. Supp. 3d 295, 315 (E.D. Pa. 2019) (finding police questioning to defendants during *Terry* frisk where police had handcuffed defendants was not a custodial interrogation and refusing to suppress defendants' statements), *aff'd*, 816 F. App'x 732 (3d Cir. 2020); *see also United States v. Coppedge*, 2008 WL 4874158, at *4 (D. Del. Nov. 10, 2008) (finding the officer's application of handcuffs "reasonable and did not convert the stop into a custodial interrogation"), *aff'd*, 369 F. App'x 338 (3d Cir. 2010); *accord United States v. Fornia-Castillo,* 408 F.3d 52, 64-65 (1st Cir. 2005) (holding defendant not in custody for *Miranda* purposes where an officer stopped defendant on a busy public road, drew his gun, handcuffed defendant for ten to fifteen minutes, frisked defendant, and questioned defendant while he was handcuffed); *United States v. Cota*, 953 F.2d 753, 758-59 (2d Cir. 1992) (holding that defendant was not in custody where the "initial use of guns and handcuffs [were] necessitated by the officer's safety, but the handcuffs were removed as soon as . . . the perceived safety threat abated").  Besides handcuffing, the officers

did not use any other coercive tactics, like yelling or other hostile tones of voice, drawing their weapons, and so on. *King*, 604 F.3d at 138.

Again, Samson handcuffed Taylor given his erratic behavior and his refusal to follow the officer's commands. There's no evidence that the officers' use of handcuffs overbore Taylor's will. Indeed, the officers remained cordial throughout the encounter, both before and after restraining him, and Taylor willingly answered the officers' questions. After handcuffing Taylor, the officers sat him down on a nearby stoop. At one point, Samson offered to remove Taylor's facemask given the heat, and even helped wipe sweat from Taylor's face. [Gov't Ex. 2.] Samson's use of handcuffs stemmed from officer safety and scene control—nothing more. *United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) ("[D]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes."). Thus, the "inherently coercive pressures" of "a station house questioning" are absent here. *Howes*, 565 U.S. at 509.

On balance, then, Taylor was not in custody for *Miranda* purposes when he admitted to possessing bullets. So the Court denies his request to suppress that statement.

### 2. Taylor was in custody when he admitted that he sells bullets, but that statement is admissible under *Miranda*'s public safety exception

But Samson's questioning evolved into a custodial interrogation once Taylor admitted to possessing bullets. A reasonable person standing in Taylor's shoes—handcuffed and having just admitted to committing a crime—would not have felt free to leave. *Cf. Locke v. Cattell*, 476 F.3d 46, 54 (1st Cir. 2007) ("We believe it likely that a reasonable person would not have felt that he was at liberty to terminate the interrogation and leave after confessing to a violent crime and learning that a co-defendant has implicated him.").

27

Even so, Samson's question about whether Taylor had a gun was proper under the public safety exception to *Miranda*. That exception allows officers to ask a person in custody "questions necessary to secure their own safety or the safety of the public" without first giving *Miranda* warnings. *New York v. Quarles*, 467 U.S. 649, 658-59 (1984). Samson asked Taylor about a gun after finding the magazine "[b]ecause it's unreasonable for . . . somebody just to carry a magazine on them without the firearm." [Hr'g Tr. 91:3 to 9.] Samson had "an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon" because he felt a magazine in Taylor's jacket and could not locate a firearm during his canvass. *Quarles*, 467 U.S. at 659 n. 8; *see also id.* at 657-58 (finding defendant's response to officer's question about the location of a gun should not have been excluded where police asked question after apprehending defendant who wore an empty shoulder holster); *United States v. Johnson*, 95 F. App'x 448, 452 (3d Cir. 2004) (finding defendant's response to officers' question "do you have a gun" properly admitted under the public safety exception to *Miranda*). And in response to Samson's direct question about the gun, Taylor went beyond the question asked: he said, "I ain't got no gun" and then blurted out, "I sell the bullets." [Gov't Ex. 2.] Because Samson's question and Taylor's response fall within *Miranda*'s public safety exception, the Court will not suppress his statement that he sells bullets.

**D. Probable Cause to Arrest and Search Incident to Arrest**

The officers lawfully arrested Taylor and seized the magazine from his jacket pocket. The Fourth Amendment allows law enforcement officers to make a warrantless arrest in public so long as the officer has probable cause to believe that the suspect has, or is committing, a crime. *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018). "Probable cause is

28

not a high bar . . . 'requir[ing] only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 57 (citations and internal quotation marks omitted). To determine whether an officer had probable cause to make a warrantless arrest, courts must "examine events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Id.* at 56-57 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

Here, the officers had probable cause to arrest Taylor once he admitted to possessing bullets in response to Samson's question during the second pat-down. Once an officer has probable cause to arrest, the search incident to arrest exception allows the officer to search an arrestee's person for weapons and evidence. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 383 (2014). Because the officers had probable cause to arrest Taylor, Marakowski lawfully removed the magazine from Taylor's jacket pocket. Thus, the police lawfully seized that evidence. The Court therefore denies Taylor's entire suppression motion.

## III. THE MOTION TO DISMISS

### A. Taylor's Second Amendment Challenges

Taylor asks this Court to dismiss his felon-in-possession of ammunition charge, in violation of 18 U.S.C. § 922(g)(1), contending § 922(g)(1) is unconstitutional on its face and as applied to him. [Def. Br. I at 29-47; Def. Suppl. Mem. of Law in Supp. of Mot. to Dismiss 1-17 (Def. Br. II) (Docket No. 27); Def. Second Suppl. Mem. of Law in Supp. of Mot. to Dismiss 1-30 (Def. Br. III) (Docket No. 37).] Pointing to the United States Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), Taylor argues § 922(g)(1) violates his Second Amendment rights to keep and bear arms, and that the Government has not carried its burden to show that § 922(g)(1) falls within this Nation's

historical tradition of firearm regulation.  [Def. Br. III at 14-27.]  And looking to the Third Circuit's decision in *Range v. Att'y Gen. U.S.*, 124 F.4th 218 (3d Cir. 2024) (en banc) (*Range II*), Taylor contends the Third Circuit has already found § 922(g)(1) unconstitutional on an as-applied challenge.  [*Id.* at 3-5.]

The Government counters, arguing Taylor is "not like Range" because of his lengthy criminal history, and as such, *Range II*'s "narrow" holding is irrelevant here.  [Gov't Second Suppl. Mem. of Law in Opp'n to Def. Mot. to Dismiss 2-3 (citation omitted) (Gov't Br. III) (Docket No. 38).]  And looking to *Range II* and the Third Circuit's decision in *Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025), the Government argues that enforcing § 922(g)(1) against Taylor is consistent with the Second Amendment given "this Nation's historical tradition of disarming individuals who pose a physical danger to others."  [*Id.* at 3.]  According to the Government, Taylor has eight felony convictions that range from drug-trafficking to aggravated assault to firearm charges.  [*Id.* at 4-5.]  Taylor's prior convictions and his post-conviction conduct, the Government argues, show he poses a danger to others and therefore can be disarmed consistent with the Second Amendment.  [*Id.* at 5-6.]

This Court has consistently rejected the very same arguments that Taylor presses here. *See, e.g.*, *United States v. Savery*, 2025 WL 1165607, at *8 (D.N.J. Apr. 22, 2025) (collecting cases rejecting identical arguments, and finding § 922(g)(1) constitutional on facial and as-applied challenges).  The Court will reject them again.

### 1.  Taylor's Facial and As-Applied Challenges Fail

Taylor's Second Amendment challenges fail because his prior convictions show he "present[s] a special danger of misus[ing firearms]," *United States v. Rahimi*, 602 U.S. 680, 698 (2024), and would likely pose an increased risk of "physical danger to others" if armed, *Range*

*II*, 124 F.4th at 232.  Indeed, "the Second Amendment's touchstone is dangerousness[.]" *Pitsilides,* 128 F.4th at 210-11 (footnote omitted) (quoting *Folajtar v. Att'y Gen.*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting)).

And consistent with the Second Amendment, the Government can disarm dangerous individuals or those who pose a threat to the public's safety.  *See, e.g.*, *Savery*, 2025 WL 1165607, at *10; *accord United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024) ("Our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous.").  This is so because this Nation has a historical tradition of disarming dangerous individuals and those who would endanger the public's safety if allowed a firearm. *Pitsilides,* 128 F.4th at 210-11 (collecting cases); *accord United States v. Connelly*, 117 F.4th 269, 277-78 (5th Cir. 2024) (reviewing various historical laws, and finding "an undeniable throughline runs through these sources: Founding-era governments took guns away from those perceived to be dangerous"); *Koons v. Platkin*, 673 F. Supp. 3d 515, 562-69 (D.N.J. 2023) (finding "this Nation has a historical tradition of disarming dangerous individuals and those who endanger the public safety" after reviewing English common law, medieval English acts and government decrees, colonial disarmament laws, state constitutional convention proposals, post-ratification disarmament laws, and Reconstruction-era disarmament laws).

Taylor's prior convictions—two convictions for unlawful possession of a weapon, multiple drug-trafficking convictions, and an aggravated assault conviction, *see* Gov't Br. II at 7—show he would pose a danger to others if armed.  Courts have found enforcing § 922(g)(1) to defendants with convictions identical to Taylor's did not violate the Second Amendment. *United States v. White*, 2025 WL 384112, at *2 (3d Cir. Feb. 4, 2025) (finding § 922(g)(1) constitutional as-applied to defendant who had prior "felony convictions for drug distribution,

aggravated assault, and carrying a firearm without a license"), *cert. denied*, 2025 WL 1679042 (U.S. June 16, 2025); *see also United States v. Goodnight*, 2025 WL 1276000, at *2 (3d Cir. May 2, 2025) (finding defendant's prior felony convictions for heroin dealing and violating gun laws were "enough evidence of dangerousness to justify disarmament"). Indeed, Taylor's drug-trafficking convictions alone are enough to disarm him. *See, e.g.*, *Savery*, 2025 WL 1165607, at *10 (holding defendant's multiple drug-trafficking convictions supported disarmament because those convictions showed the danger that defendant posed to others); *United States v. Trusty*, 2025 WL 830124, at *4-5 (D.N.J. Mar. 17, 2025) (denying as-applied and facial challenges to § 922(g)(1), finding defendant's "four prior drug convictions" showed his danger to the public's safety "because *drug dealing* is inherently dangerous" (emphasis in original)); *see also Pitsilides,* 128 F.4th at 212-13 (explaining "drug dealing" is "dangerous because [it] often lead[s] to violence") (quoting *Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting)). Thus, enforcing § 922(g)(1) against Taylor does not violate his Second Amendment rights.

Taylor's failure to show § 922(g)(1) is unconstitutional as applied to him dooms his facial challenge to that law. *United States v. Mitchell*, 652 F.3d 387, 415 (3d Cir. 2011) (en banc) ("Because the statute is constitutional as applied to [defendant], he has not shown that 'there is no set of circumstances' under which the statute may be applied constitutionally."); *see also United States v. Moore*, 111 F.4th 266, 273 n. 5 (3d Cir. 2024) (holding defendant's facial challenge to § 922(g)(1) failed where defendant's as-applied challenge failed because defendant could not "establish that no set of circumstances exists under which the Act would be valid"

(quoting *Rahimi*, 602 U.S. at 693)), *cert. denied*, 2025 WL 1787742 (U.S. June 30, 2025).  As a result, the Court denies Taylor's motion to dismiss.[3]

## B.  Indictment's "Ghost Gun" Allegations

Taylor initially moved to dismiss his § 922(g)(1) charge for lack of an interstate commerce nexus, or in the alternative, for a bill of particulars to order the Government to show the indictment's "ghost gun" allegations satisfy § 922(g)(1)'s interstate nexus requirement.  [Def. Br. I at 48-51.]  The Government has since clarified that it is not charging Taylor with possessing the ghost gun; his § 922(g)(1) charge is based on his possession of ammunition.  [Gov't Br. I at 18-19.]  Taylor now shifts, asking this Court to strike any reference to the "ghost gun" in the indictment as surplusage.  [Hr'g Tr. 101:1 to 5, 103:4 to 5.]  The Government opposes that request.  [*Id.* at 101:10 to 16.]

Federal Rule of Criminal Procedure 7(d) permits a court, upon a defendant's motion, to "strike surplusage from the indictment . . . ."  Fed. R. Crim. P. 7(d).  To succeed, the defendant must show that the challenged language is both irrelevant (or immaterial) to the charged offenses and prejudicial.  *United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006) ("Logic demands the conjunctive standard: information that is prejudicial, yet relevant to the indictment, must be included for any future conviction to stand, and information that is irrelevant need not be struck if there is no evidence that the defendant is prejudiced by its inclusion.").  This is an "exacting standard" to meet, and courts will grant motions to strike

---

[3] At the evidentiary hearing, Taylor requested leave to file another supplemental brief on whether he would be entitled to an evidentiary hearing on his motion to dismiss.  [Hr'g Tr. 104:3 to 10.]  He later withdrew that request.  [Docket No. 47.]  At any rate, courts need not hold an evidentiary hearing on Second Amendment challenges to § 922(g)(1).  *See Williams*, 113 F.4th at 662 (explaining "a court can accept prior convictions without an evidentiary hearing" (citation omitted)).  Courts may look to the nature of the prior felony to determine whether a defendant "present[s] a special danger of misusing firearms" because certain offenses "may offer conclusive evidence that someone poses such a danger[.]"  *Pitsilides*, 128 F.4th at 211.

"only where it is clear that the allegations contained [in the indictment] are not relevant to the charge made or contain inflammatory or prejudicial matter." *United States v. Alsugair*, 256 F. Supp. 2d 306, 317 (D.N.J. 2003) (quoting *United States v. Vastola*, 670 F. Supp. 1244, 1254 (D.N.J. 1987)).  Courts will not strike language from an indictment even where the language, "while not essential to the charges, . . .  is in a general sense relevant to the overall scheme charged in the indictment."  *United States v. Giampa*, 904 F. Supp. 235, 271-72 (D.N.J. 1995) (citation and internal quotation marks omitted).

The indictment here charges Taylor as follows:

> On or about June 30, 2022, in Camden County, in the District of New Jersey and elsewhere, [Taylor] knowing that he had previously been convicted in a court of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess a loaded 9mm privately manufactured firearm, commonly referred to as a "ghost gun," stamped "Patmos" and ammunition, namely, one magazine containing 15 9mm caliber rounds, one magazine containing 30 9mm caliber rounds and one 9mm caliber round in the ghost gun, and the ammunition was in and affecting commerce.

[Docket No. 1.]  As pled in the indictment, the Government has charged Taylor with violating § 922(g)(1) based on possessing ammunition loaded in two magazines and the ammunition loaded in the ghost gun.  [*Id.*]  Based on the indictment's wording, the Government intends to prove that Taylor possessed the ammunition found in the ghost gun.   So, the indictment's allegations about possessing the ghost gun cannot be stricken because those allegations are relevant to Taylor's possession of the ammunition loaded in that weapon.  The Government can include allegations in an indictment that it intends to prove at trial "even if they are not essential elements of the crime charged."  *Giampa*, 904 F. Supp. at 271 (citation and internal quotation marks omitted).  Accordingly, the Court denies Taylor's motion to strike.

## IV.  THE MOTION FOR DISCOVERY

Lastly, Taylor had moved for a host of discovery.  [Def. Br. I at 52-59.]  At the hearing, however, Taylor agreed that the discovery motion is moot.  [Hr'g Tr. 107:3 to 19.]  The Court will therefore deny those aspects of the omnibus motion as moot.  If the Government does not provide any of the requested discovery, Taylor may seek such discovery from the Court.

## V.  CONCLUSION

For the above reasons, the Court **DENIES** those aspects of Taylor's omnibus motion seeking to suppress evidence and to dismiss the indictment, and the Court **DENIES AS MOOT** those aspects of Taylor's motion seeking discovery.  [Docket Nos. 20, 27, 37.]  An accompanying Order of today's date shall issue.

**s/Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge

Dated: July 18, 2025